## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATALIE MUNROE,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 12-03546** |
| | : | |
| **CENTRAL BUCKS SCHOOL** | : | |
| **DISTRICT,** *et al.,* | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

**RUFE, J.**                                                                    **JULY 25, 2014**

Plaintiff Natalie Munroe brings this action under 42 U.S.C. § 1983, alleging that Defendants Central Bucks School District, Superintendent N. Robert Laws, and Principal Abram Lucabaugh retaliated against her for the legitimate exercise of her First Amendment rights. Specifically, Munroe claims that the school administration harassed and eventually terminated her after discovering a private blog in which Munroe has expressed criticism of the school, her co-workers, and her students. Having proceeded through discovery, Defendants now move for summary judgment. For the reasons stated below, the motion will be granted.

## I.      FACTS

Except where noted, the key facts are largely undisputed; disputed facts are viewed in the light most favorable to Plaintiff, the non-moving party. Natalie Munroe was hired by the Central Bucks School District in 2006.[1] She was assigned to teach English at Central Bucks East High School in Doylestown, Pennsylvania.[2] Plaintiff's performance evaluations showed that her

---

[1] Am. Compl. ¶ 7.

[2] *Id.* ¶ 8.

supervisors regarded her as an effective, competent teacher.[3] One early review, written by a supervising principal and dated October 23, 2006, praised Munroe for her abilities and effort, noting that "[y]our lesson plans and presentation in class prove to me that you work very hard. Continue to look for opportunities to have students work as hard as you do."[4] The evaluations that followed in the next four years are in a similar vein; from 2006 until 2010, all of her regular evaluations deemed her performance "satisfactory."[5] In June of 2008, Defendant Lucabaugh, Plaintiff's immediate supervisor, wrote a letter of recommendation in support of Munroe's application to a graduate program, in which he described Plaintiff as a "woman of utmost integrity, character, and intelligence," and wrote of her "meticulous, conscientious manner."[6] Munroe received tenure in 2010 on the recommendation of her supervisors.[7] Positive evaluations continued until the school's discovery of Munroe's blog in 2011.[8]

In 2009, Munroe began a blog titled, *Where are we going, and why are we in this handbasket?*[9] Munroe blogged as "Natalie M" and did not state where she worked or lived.[10] Munroe published a total of 84 blog posts between 2009 and 2010, mostly writing about personal matters unlikely to be of interest to the general public, including her food and film preferences,

---

[3] *Id.*

[4] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 5 (Doc. 23-2 at 3).

[5] *Id.,* Exs. 9 – 12, 15, 16, 21, 25.

[6] *Id.,* Ex. 13.

[7] *Id.,* Ex. 18.

[8] Defendants contend that Plaintiff's work performance had declined as early as 2010, and that her termination was ultimately the result of a pattern of poor performance, rather than the scandal surrounding her blog. Defs.' Mem. Supp. Mot. Summ. J., at 2-3.

[9] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 23.

[10] Am. Compl. ¶ 16.

her children, and her regular yoga classes.[11] But on a number of occasions, she wrote about her students and co-workers. Without using names or specific dates, Munroe complained about the rudeness and lack of motivation among her students, referring to them as "jerk," "rat-like," "dunderhead," "whiny, simpering grade-grubber with an unrealistically high perception of own ability level" and "frightfully dim."[12]  Plaintiff wrote that parents were "breeding a disgusting brood of insolent, unappreciative, selfish brats."[13] She referred to a co-worker by first name and with a vulgar epithet.[14] Plaintiff also complained about the school administration, writing that she had observed the administration harass a colleague until he resigned because the administration felt that he was an ineffective teacher.[15] Munroe claims that, for most of its history, the blog enjoyed no more than nine subscribed readers, two of whom were the plaintiff and her husband.[16]

The school administration learned of the blog in February 2011, when a reporter from a local newspaper, *The Intelligencer*, began asking questions regarding the blog and its contents.[17] On February 8, 2011, the reporter wrote in an email seeking comment that "students apparently have been circulating [the blog] on [F]acebook and through other social media."[18] The next day,

---

[11] *See* generally Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 23.

[12] *Id.*, Ex. 23 (Doc. 23-4 at 39).  Plaintiff also used various expletives in her descriptions.

[13] *Id.* at 43.

[14] *Id.* at 3.

[15] *Id.* at 35.

[16] Dep. of Natalie Munroe, Aug. 9, 2013, at 42. Defendants assert that plaintiff may have "invited" students to attempt to find and read her blog, and that she intended to be known as the author of those entries.  Ans. to Am. Compl., at ¶ 14.

[17] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 25.

[18] *Id.*

Lucabaugh summoned Munroe to a meeting, confronted her with printed copies of the blog, and placed her on immediate, unpaid suspension.[19] Later that day, Lucabaugh made a statement to the press regarding the blog.[20] The following morning, the story was picked up by *The Huffington Post*, a widely-read internet news site.[21] News of Plaintiff's suspension attracted the attention of several major news agencies and syndicates, including CBS, ABC, NBC, CNN, Fox News, Reuters, the Associated Press, and the *Philadelphia Inquirer*.[22] Munroe soon appeared in several televised interviews, where she defended her views and insisted that she had been unfairly disciplined.[23] Defendant Laws expressed his desire to have Plaintiff's employment terminated.[24] Munroe went on planned maternity leave from March 1, 2011, until the end of the semester.[25] On June 15, 2011, Lucabaugh authored an evaluation of Munroe that deemed her performance for the preceding academic term "unsatisfactory."[26] On June 20, 2011, Laws submitted an "Educator Misconduct Complaint" to the Commonwealth of Pennsylvania; the Commonwealth's Office of General Counsel declined to take action.[27] Plaintiff returned to work in August 2011, and continued to receive negative evaluations.[28] Defendants denied Munroe's

---

[19] Am. Compl. ¶¶ 20-22.

[20] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 26.

[21] *Id.*

[22] Munroe Dep. at 68-69.

[23] *Id.* at 58; 71-72.

[24] Pl.'s Mem. Opp. Defs.'s Mot. Summ. J., Ex. 27.

[25] Munroe Dep. at 58.

[26] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 31.

[27] *Id.,* Exs. 30, 32.

[28] At the time of Plaintiff's return, Lucabaugh issued a statement providing in part that "[n]o one here is contending that she can't say these things . . . legally.  And for that reason, she has a <u>legal</u> right to return."  *Id.* Ex. 35.  Lucabaugh did not specify, however, whether that assessment was based upon the United States Constitution,

request to transfer to another school within the district on the grounds that it was too late to effect such a change under her employment contract.[29] Munroe's supervisors required her to complete detailed and exhaustive lesson plans,[30] which she felt were deliberately engineered to be too difficult to complete adequately.[31] Finally, after receiving notice of the school's intention to terminate her contract,[32] Munroe's employment was terminated on June 26, 2012.[33]

## II.   STANDARD OF REVIEW

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[34] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[35] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[36] "On summary judgment, inferences to be drawn from underlying facts contained in (the moving party's) materials must be viewed in light most favorable to the party opposing the motion."[37]

---

state law, or Plaintiff's employment contract, and therefore the Court does not find it precludes Defendants from arguing that Plaintiff's constitutional rights were not violated.

[29] *Id.* Exs. 33, 34.

[30] Munroe Dep. at 275-78; 285-87.

[31] *Id,* 282-85.

[32] Pl.'s Mem. Opp. Defs.'s Mot. Summ. J., Ex. 40.

[33] Am. Compl. ¶ 29(n).

[34] Fed. R. Civ. P. 56(a).

[35] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[36] *Id.*

[37] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970) (internal quotation omitted).

## III.    DISCUSSION

To state a § 1983 claim for unlawful retaliation based on her expression of constitutionally protected views under the First Amendment, Plaintiff must demonstrate that (1) the speech in question was constitutionally protected, and (2) the exercise of that protected speech was a substantial factor in the alleged retaliation.[38] The first determination is a matter of law, the second a question of fact.[39] Public employees such as Plaintiff do not surrender their constitutional rights as a condition of employment, but courts also have recognized the need of the public employer to maintain efficiency and effectiveness in performance of its official duties.[40] Therefore, courts must "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer], in promoting the efficiency of the public services it performs through its employee."[41]

A public employee's speech is protected when he or she (1) speaks as a private citizen upon (2) a matter of public concern, and (3) the employee's interest in exercising his or her First Amendment rights is greater than the employer's interest in the efficient operation of the public agency.[42] Although each instance of allegedly protected speech should be considered individually,[43] a court must examine the "content, form, and context of a given statement, as

---

[38] *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006) (citing *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005)).The Third Circuit has also stated the relevant standard as requiring that a plaintiff establish "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

[39] *Hill,* 455 F.3d at 241.

[40] *Lane v. Franks,* 134 S. Ct. 2369, 2377 (2014) (citing *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006)).

[41] *Pickering v Bd. of Ed. of Tp. High Sch. Dist. 205,* 391 U.S. 563, 568 (1968).  A defendant also may defeat a plaintiff's case by showing that the plaintiff's employment status would have been changed regardless of any allegedly controversial speech. *Ambrose v. Tp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002).

[42] *Garcetti,* 547 U.S. at 418 (citing *Pickering,* 391 U.S. at 568).

[43] *Johnson v. Lincoln Univ. of Com. Sys. of Higher Ed.,* 776 F.2d 443, 451 (3d Cir. 1985) ("The court, then,

revealed by the whole record"[44] to determine whether it relates "to any matter of political, social, or other concern to the community."[45] Even if otherwise protected by the Constitution, a plaintiff's interest in exercising his or her First Amendment rights "must outweigh the employer's interest in the effective operations of its public services."[46] This is a "fact-sensitive inquiry" that requires "consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest."[47]

Courts have recognized that public employees have the freedom to participate as private citizens in well-informed public debate, including concerning the employee's own work.[48] For example, courts generally have attached great weight to the value of statements that give meaningful insight into the operations of a public agency, even if those statements cause some public controversy.[49] The burden falls upon the government employer to show disruption.[50] Context is crucial, as the "employing agency's institutional efficiency may be threatened not

---

cannot make a superficial characterization of the speech or activity taken as a whole; to do so would undermine the entire purpose of the *Pickering* test.").

[44] *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

[45] *Id.* at 146.

[46] *Miller v. Clinton Cty.,* 544 F.3d 542, 548 (3d Cir. 2008).

[47] *Id.* (citing *Connick,* 461 U.S. at 152).

[48] *San Diego v. Roe,* 543 U.S. 77, 82 (2004) (*per curiam*) ("Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues.").

[49] *See, e.g.*, *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir. 1983) (holding that a county employee who alleged wrongdoing in his public agency to a county board meeting gave important insight into the operation of that agency, despite the obvious disruption that followed it).

[50] *United States v. National Treasury Employees Union,* 513 U.S. 454, 466 (1995) (citing *Rankin v. McPherson,* 438 U.S. 378, 388 (1987)); *Waters v. Churchill,* 511 U.S. 661, 673 (1994) ("[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.").

only by the content of the employee's message but also by the manner, time, and place in which it is delivered."[51]

For the purposes of this summary judgment motion, neither party disputes that Munroe wrote as a private citizen in her blog, and that she did not direct her speech to her employers. The parties diverge sharply, however, on the remaining issues. [52] After carefully considering the entire record, the Court has determined that although the blog as a whole is dominated by personal issues, within certain blog posts are occasional passages that touch upon broad issues of academic integrity,[53] the value of honor,[54] and students' lack of effort.[55] Each of these topics is a matter of political and social concern, despite the strong language Plaintiff used.[56] However, context matters. In *Miller v. Clinton County,* an employee of a county probation office wrote a letter to a local Common Pleas judge, alleging that her supervisor was ineffective and had aired unprofessional opinions of probationers, whom he called "scum."[57] The Third Circuit held that:

> Upon considering the entirety of Miller's letter it is obvious that, although a small portion of the letter touches upon a matter of public concern, the context in which the statement occurs establishes that the speech is not protected. Miller's letter focused upon her private grievances as an employee . . . . The personal context in which Miller's letter arose, in addition to the tangential connection between the issues of public concern and the overall thrust of the letter so minimizes any

---

[51] *Connick,* 461 U.S. at 153 (quoting *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 415 n.4 (1979)).

[52] Although Defendants contend that Plaintiff was not terminated because of her speech, they nonetheless argue that the speech was not protected.  Regardless of Defendants' true motivation in firing Plaintiff, she cannot prevail unless she prevails under the *Pickering* balancing test.

[53] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 23 (Doc. 23-4 at 15).

[54] *Id.* at 33-34.

[55] *Id.* at 16.

[56] *Rankin,* 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern.").

[57] 544 F.3d 542.

public concern in the subject of her expression as to tip the First Amendment
balance in favor of her employer.[58]

Similarly, on the few occasions where Munroe addressed issues of public concern in her
blog, she did so in order to discuss other, personal issues. Far from implicating larger discussions
of educational reform, pedagogical methods, or specific school policies, Plaintiff mostly
complained about the failure of her students to live up to her expectations, and focused on
negative interactions between herself and her students.[59] In one memorable passage, Plaintiff
began by declaring that she was blogging "at work."[60] She stated that she had been entering
grades and comments on the grades, something toward which she used to devote "a lot of time
and effort" when first teaching.[61] Instead of using this introduction as a springboard for any
number of important discussions (such as the value of the grading system in public school, her
personal opinion on the effectiveness of assigning grades, etc.) that might have touched upon real
issues of public concern, Plaintiff noted that "[f]or some kids, though, my scornful feelings reach
such fever pitch that I have a hard time even putting 'cooperative in class' and have, sadly, had
some kids for which none of the comments fit."[62]  Plaintiff then made a list of comments she
wished she could write, such as: "A complete and utter jerk in all ways. Though academically
ok, your kid has no other redeeming qualities"; "Just as bad as his sibling.  Don't you know how
to raise kids?"; "Liar and cheater"; and "Utterly loathsome in all imaginable ways."[63] Whatever

---

[58] 544 F.3d at 550-51.

[59] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 23 (Doc. 23-4 at 33).

[60] *Id.* at 38.

[61] *Id.*
[62] *Id.*

[63] *Id.*

public concern she occasionally touched on is subsumed by personal invective; the blog's "overall thrust" devalues the discussion of public issues.[64]

Once the blog became known to the school community, the language that Munroe used to describe her students and co-workers in the blog soured Plaintiff's relationship with the school administration, and it had the potential to do so even before the case garnered the attention of the media. Although Munroe may have occasionally written as a private citizen on matters of public concern, she chose to do so in an opprobrious tone that was likely to generate a strong reaction from anyone connected with the school who read it.  Plaintiff published her views on the internet, where they were later discovered and circulated to the extent that a local journalist learned of it. The discovery of the blog undermines Plaintiff's early assumptions that her small readership and relative anonymity would protect her personal comments from reaching their subjects, especially as the blog was not password protected.  And although she had no legal obligation to mitigate the damage caused by the media's attention to her story, Munroe's media interviews did not take a conciliatory approach, and instead seem to have fanned the flames of controversy.[65]

In balancing the interests of the parties, the Court notes that the school had no regulation forbidding teachers from blogging until after the blog's discovery.[66]  Public employers may regulate disruptive or unprofessional conduct, however, even without the benefit of a

---

[64] *Miller,* 544 F.3d at 550.

[65] Although the Court has focused on the Plaintiff's 2009-2010 blog posts (because the record is clear that Defendants' actions were based upon these writings), the analysis would not change upon a consideration of  entries made after the discovery of the blog , or upon consideration of the interviews Plaintiff gave to the media.

[66] Pl.'s Mem. Opp. Defs.'s Mot. Summ. J., Ex. 24.

proscriptive policy or ethical guideline.[67]  In addition, "where close working relationships are essential and where the speech does not involve matters of significant public concern, the organization need not wait for the full disruptive impact before taking action."[68] Plaintiff worked in a school, where students "are impressionable and their attendance is involuntary."[69] The position of public school teacher "requires a degree of public trust not found in many other positions of public employment."[70] Students who read or were aware of Munroe's blog were confronted with Plaintiff's vivid and personal appraisal of their character.  This is heightened by the fact that although no names were used, in some blog posts the students would have been identify themselves or their classmates.  As an example:

> Things From This Day That Bothered Me
>
> l. The fact that it was 85 degrees in my classroom because the district insists on controlling the temperature from central admin and won't turn on the AC until May 15th, even though people are sweltering NOW.
> 2. The fact that I called home about an obnoxious kid in class last week before break and his mom said they told him to "knock it off" (the obnoxious behavior), yet the FIRST thing he said to me when he saw me today was, "Yeah, Ms. M. I give you credit for tryin' to ruin my weekend. But the boys rallied up and had a banger anyway!" Clearly, the talk with his mom was quite effective.
> 3. The fact that several students in 3rd block did a lame job on their easy assignment today.
> 4. The fact that the jerk who was out 3 days around our last major assessment because his family took him on trip to Puerto Rico and then emailed me all of this nonsense about how he shouldn't have to take the test on time because he was "excused" for those days, was out again today (the date of another assessment)

---

[67] *See Craig v. Rich Tp. High Sch. Dist.,* 736 F.3d 1110 (7th Cir. 2013) (holding that a school did not violate § 1983 by terminating a guidance counselor for writing a book with  graphic sexual detail because it interfered with his ability to guide students made uncomfortable by the book's content), *cert denied,* 134 S. Ct. 2300 (2014).

[68] *Versarge v. Twp. Of Clinton,* 984 F.2d 1359, 1366 (3d Cir. 1993).

[69] *Edwards v. Aguillard,* 482 U.S. 578, 584 (1987).

[70] *Melzer v. Bd. of Educ. of the City Sch. Dist. of the City of New York,* 336 F.3d 185, 198 (2d Cir. 2003); *see also Anderson v. Evans,* 660 F.2d 153 (6th Cir. 1981) (holding a Tennessee school teacher was appropriately terminated for making racially-charged comments which eroded the trust and respect necessary for effective teaching).

because his family took him to the effing Master's golf [expletive] over Easter break. Can someone please tell me why Thursday-Wednesday wasn't enough time off to do what had to be done such that he could come back today when he KNEW there was an assessment??? It's good that people value school so mu-- wait, no, they don't.
5. The new chick who seems to be on or near my elliptical all the damn time.[71]

Defendants were within their rights to conclude that the blog posts would erode the necessary trust and respect between Munroe and her students, and the record shows that at the behest of concerned parent, the school permitted students to opt out of Munroe's class.[72]

Munroe's speech in this case is distinguishable in tone and content from speech that has enjoyed protection in other cases. In *Pickering v. Board of Education*, the case that established the balance-of-interests test, a public school teacher was dismissed after he wrote a letter published in the local newspaper that criticized the school board's handling of proposed tax increases.[73] The Supreme Court held the termination wrongful, finding that the manner in which the teacher had expressed his views (which addressed matters of clear public concern), and the "massive apathy and total disbelief"[74] which they had received from the public, did not seriously threaten the school's efficient operation.[75] The teacher's conduct "neither [was] shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally."[76] In *Monsanto v. Quinn,* an internal revenue officer was suspended after writing

---

[71] Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Ex. 23 (Doc. 23-4 at 6).

[72] Dep. of Abram Lucabaugh, Aug 7, 2013, 168; Munroe Dep., 60- 66.

[73] 391 U.S. 563 (1968).

[74] *Id.* at 571 (footnote omitted).

[75] *Id.* ("[T]he only way in which the Board could conclude . . . that the statements contained therein were per se detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools.").

[76] *Id.* at 572-73.

letters to the Commissioner of Finance in which he complained of low morale, office inefficiency, and corruption in his local office.[77] The Third Circuit held that the officer had been a demonstrably good employee, and that the letters had made no measurable impact on either his performance or the operations of his office.[78] To Munroe's credit, there is substantial evidence that she, like the plaintiffs in *Pickering* and *Monsanto,* was generally considered a good employee prior to the discovery of her controversial statements, notwithstanding Defendants' assertions to the contrary.[79] But in both *Monsanto* and *Pickering,* the plaintiffs spoke *only* to address matters of public concern, avoided use of personal or inflammatory invective, and although the letters in those cases provoked the ire of their superiors, there was no showing by the defendants in either case that the statements had caused any serious disruption to office operations.[80] Here, Munroe's blog contains gratuitously demeaning and insulting language inextricably intertwined with her occasional discussions of public issues, and far from the "massive apathy" with which Pickering's letters were received, Munroe's statements attracted considerable negative attention, from concerned parents and from the public at large.

Upon consideration of the entire record, the Court concludes that Defendants did not violate Plaintiffs' constitutional right to free expression. Because this Court has determined as a matter of law that Plaintiff's comments do not merit protection under the balancing test established by *Pickering,* it is not necessary to reach the question of whether her statements were a direct cause of her termination.

---

[77] 674 F.2d 990 (3d Cir. 1982).

[78] *Id.* at 997.

[79] *See, e.g.*, Pl.'s Mem. Opp. Defs.'s Mot. Summ. J., Ex. 37 (dated Sept. 21, 2011).

[80] 391 U.S. at 572-73; 674 F.2d at 997.

**IV.     CONCLUSION**

Education is one of the most heavily protected public interests in modern American jurisprudence.[81] At the same time, free speech is "the matrix, the indispensable condition, of nearly every other form of freedom."[82] In this case, Plaintiff's speech, in both effect and tone, was sufficiently disruptive so as to diminish any legitimate interest in its expression, and thus her expression was not protected. As Plaintiff has not raised any other claims under federal or state law for the Court to consider here, Defendants' motion for summary judgment will be granted. An order will be entered.

---

[81] *Brown v. Bd. of Ed. of Topeka,* 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments.").

[82] *Palko v. Connecticut,* 302 U.S. 319, 327 (1937) *overruled on other grounds, Benton v. Maryland*, 395 U.S. 784 (1969).